GOLDMARK *et al. v.* KRELING *et al.*

(*Circuit Court, N. D. California.* June 10, 1888.)

1. COPYRIGHT—COMMON-LAW RIGHT—RIGHTS OF PURCHASER—SUBSEQUENT PUBLICATION.

Where an author sells the exclusive right to use an operetta in America, and the purchasers are in possession of the manuscript before there is any publication in this country or Europe, the author cannot thereafter sell the right to a third person to perform it in this country, or dedicate it to the public by publication, so as to defeat the purchasers' prior exclusive right.

2. SAME—INFRINGEMENT—WHAT CONSTITUTES—OPERETTA "NANON."

Plaintiffs were the exclusive owners of the manuscript copy of the operetta "Nanon." Defendants were producing a play under the name of "Genee's Nanon, the reigning Eastern and European sensation," which they claimed to have translated and adapted from an old French story, "Nanon." Both plays contained eight characters in common, not in the French; one character had the same name in each, different from the French; the scenes and situations in each were alike, each had ideas expressed alike, not in the French; and defendants advertised their adaptation as "Genee's," and not as their own, from the French. *Held,* that defendants' play was substantially the same as complainants', with only colorable changes; that plaintiffs were entitled to an injunction to restrain defendants from performing it as a whole, or the piano score, the libretto, containing the dialogue, stage business, situations, etc., or any part as performed by defendants, except the orchestration, which was their own work, or any work under the name of "Nanon" or "Genee's Nanon, the reigning Eastern and European sensation."

In Equity. On bill to enjoin the production of an operetta.

Complainants, Leo Goldmark and another, filed a bill against Joseph Kreling and others, to enjoin them from producing the operetta "Nanon," basing their right of action on their common-law right of ownership, and not on a copyright. For proceedings dissolving the injunction for failure to give proper bond, and the subsequent reinstatement of the case, see 25 Fed. Rep. 349, and 11 Sawy. 215.

Before FIELD, Justice, SAWYER, Circuit Judge, and HOFFMAN, District Judge.

SAWYER, J. We shall limit ourselves to briefly indicating the points of our decision, without any elaborate discussion of the evidence. The law protecting the rights of authors in their compositions, literary and musical, where they have not been dedicated to the public, or, published with the author's consent, is well established.

In this case, although the piano score was published in Europe, it

does not appear very clearly, if at all, that it was with the authors' assent. But assuming that it was with their consent, the testimony of both Goldmark and Conried, is, that it was not published, or any part of the operetta, with their consent, either in Europe or America. The operetta was completed in September, 1884, and a manuscript copy, immediately, transmitted by the authors to Goldmark and Conried,. who purchased the exclusive right to use it in America, before it was written, so that they were the exclusive owners for America, and in possession of the manuscript before there was any publication of any part in Europe or America. The authors, certainly, could not have sold, and conveyed, any right to a third party to perform their operetta in America, so as to cut off the prior exclusive right conveyed to Goldmark and Conried. If they could not cut them off by subsequent sale, we do not perceive how they could do it by a subsequent dedication to the public by publication. In our judgment, defendants had no right to use the piano score, even if it had been published by the authors in Europe after the right of complainants had attached. We are not certain, that it was published with the consent of the authors. There is no direct evidence of it, and the testimony of Goldmark and Conried tends the other way. But concede it to be so, there was no consent of complainants, in whom the exclusive right for America had already vested.

That the defendants made their own orchestration from the piano score is conceded. Admitting that they had a right to use it, alone, or with any other matter in which the complainants had no exclusive vested right, still they did not have a right to perform the play as a whole, with the orchestration, or the orchestration with any part of the operetta, not dedicated to the public, as they advertised and were proceeding to do. The respondents do not claim, that the dialogue and stage work belonging to it, had ever been published with the authors' consent, or that it had ever been dedicated to the public. They do not claim a right to use that part of the operetta. Their position on this point, is, that they did not use it, but made a new and independent adaptation from an old French story, "Nanon, Ninon, et Maintenon," which they say they sent to Paris for, and there obtained. Joseph Kreling's testimony is positive that he never saw or heard "Nanon," as performed by the complainants, but that he translated and adapted the French play, Exhibit 2. The complainants, Goldmark and Conried, on the contrary, testify that defendants' operetta is taken bodily from complainants' operetta. In their affidavits resisting a preliminary injunction, the defendants did not pretend to then have, or know, positively, of the French play; but stated on information and belief, that there was one, which could be had. This fact casts suspicion on their good faith now. The complainants' play is found in Exhibit D, and respondents' in exhibit, called their "prompt book," and the French play, from which defendants claim to have made the adaptation, in Exhibit 2: Upon comparison, it will be found, as we think, that respondents' adaptation is, substantially, that of complainants, with only colorable changes. There are several characters,—eight, we believe,—in complainants' operetta, that

are not in the French play, and all these characters are also in the defendants'. One character, D'Aubiere, in the French play has an incognito name, "Lavalier," whereas his incog. name in both complainants' and defendants' play is Grignan. The scenes and situations in complainants' and defendants' adaptations are alike, and different from the French. Exhibits 3, defendants' operetta, and D, complainants', have ideas expressed in common, not found in the French, and one character in common—the king—not in the French. We are satisfied, notwithstanding their denial, that the defendants must have adapted their play from the complainants', and not from the French. They also advertised the operetta as being Genee's work, and not their own, from the French. They called it "Genee's Nanon, the reigning European and Eastern sensation." We have no doubt, also, that the evidence is sufficient to show that Genee and Zell were the authors. The defendants deny, argumentatively, in their answer, the allegation of authorship, but not in such form as to make it evidence. They argue it on the theory that the Frenchman was the author, and not Genee, and do not pretend to have personal knowledge. Besides, in all other parts of the answer, and in their testimony, they, unconsciously, often speak of it as Genee's. Every exhibit they put in to show a publication both in the German and English represents it as Genee's, and there is no suggestion anywhere that anybody else is the author. The public accept it as theirs. Besides, Conried testifies that he was in Vienna while they were writing it, before it was finished, and that portions of it were played or rehearsed to him by Genee. Genee and Zell assumed to be the authors, and sent the manuscript to New York to them as authors. The evidence, in our judgment, is sufficient to establish the authorship, and so it was held in one of the pamphlet cases cited,—*Goldmark* vs. *French*,—where a similar question as to authorship was raised, on less satisfactory testimony than there is in this case. The authorship in that case was sustained. We are of opinion, therefore, that the defendants should be restrained from performing the operetta as a whole, and from performing the piano score, or the libretto containing the dialogue, stage business, situations, etc., or any part of the operetta as performed by defendants, and threatened to be performed by them, except the orchestration, which was their own work; and that they should, also, be restrained from performing any operetta under the name of "Nanon," or as "Genee's Nanon, the reigning European sensation," etc. Let a decree be entered accordingly, with costs.